```
                    IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
                         JACKSONVILLE DIVISION

    UNITED STATES OF AMERICA,        Jacksonville, Florida

         Plaintiff,                  Case No. 3:19-mj-1390-PDB
                                               3:19-mj-1392-PDB
    vs.
                                     October 23, 2019
    FAN YANG and YANG YANG,
                                     1:04 p.m.
         Defendants.
                                     Courtroom No. 10D
    _____
```

DIGITALLY RECORDED STATUS OF COUNSEL AND DETENTION HEARINGS
           BEFORE THE HONORABLE PATRICIA BARKSDALE
                UNITED STATES MAGISTRATE JUDGE

GOVERNMENT COUNSEL:

             **MICHAEL COOLICAN, ESQ.**
             United States Attorney's Office
             300 North Hogan Street, Suite 700
             Jacksonville, Florida  32202

DEFENSE COUNSEL:

             **D. CHRISTOPHER CARSON, ESQ. (FAN YANG)**
             **DALE C. CARSON, ESQ.**
             Dale Carson Law
             233 East Bay Street, Suite 1101
             Jacksonville, Florida  32202

             **ALEX KING, ESQ.  (YANG YANG)**
             **SCOTT MONROE, ESQ.**
             Monroe & King
             200 East Forsyth Street
             Jacksonville, Florida  32202

COURT REPORTER:

             Shannon M. Bishop, RDR, CRR, CRC
             221 North Hogan Street, #150
             Jacksonville, Florida  32202
             Telephone:  (904)549-1307
             dsmabishop@yahoo.com

(Proceedings reported by mechanical stenography; transcript
produced by computer.)

# T A B L E   O F   C O N T E N T S

Page No.

WITNESS FOR THE DEFENDANTS:

**JIM HARBAUGH**
Direct Examination................................  31
Cross-Examination................................  35

## N O   E X H I B I T S   R E C E I V E D

1          P R O C E E D I N G S

2    October 23, 2019                              1:04 p.m.

3                         - - -

4          THE COURT:  Mr. Coolican?

5          MR. COOLICAN:  Thank you, Your Honor.  May it please

6    the Court?

7          The primary question for the Court today is whether

8    it's more likely than not that the defendants present a flight

9    risk.

10         If the Court finds by a preponderance of the evidence

11   that the conditions -- that there's no condition of release

12   that would assure the defendant's appearance at future

13   proceedings, then the Court, under the bond reform act, would

14   be obligated to order them both detained pending trial.  And

15   that's the government's primary concern, is risk of flight in

16   this case.

17         Mr. Yang is a naval flight officer, as distinct from

18   a naval aviator.  Naval flight officers operate the sensors and

19   weapons systems in the back of naval aircraft.

20         The particular aircraft -- his aircraft is the P-8,

21   which is the Navy's latest land-based anti-submarine warfare,

22   or ASW, platform.  It's equipped with some of the Navy's latest

23   ASW weapons and sensors.

24         And he's completed a tour of duty with a P-8 squadron

25   over several years, and is currently assigned -- or until

1   recently, was assigned to the Maritime Patrol Reconnaissance

2   Weapons School.  Think, Your Honor, Top Gun for land-based ASW

3   warfare.  That school teaches advanced anti-submarine warfare

4   tactics to experienced anti-submarine warfare operators.

5           And Mr. Yang is an experienced anti-submarine warfare

6   operator himself.  And as such, and as an instructor at that

7   school, his head is filled with some of this nation's top

8   defense secrets.

9           Throughout his career, it's been his job to learn the

10  P-8s sensors, its processors, its communication systems, its

11  weapons systems, and the tactics of how the Navy uses those or

12  plans to use those systems to find submarines of its

13  adversaries.

14          And he's also familiar with those type of systems

15  that exist in other Navy platforms, because it's part of the

16  P-8's job to coordinate with submarine -- anti-submarine

17  platforms, be they surface ships of the Navy or other aircraft.

18          So in Mr. Yang's head, he's got a golden ticket, a

19  bargaining chip.  And if given a bond, Your Honor, adversaries

20  of the United States would be falling over themselves to help

21  him get out of the United States and give him a new life, in

22  exchange for those secrets.

23          And there's every reason to think that such

24  adversaries would extend the same deal to Mrs. Yang and her

25  children in hopes of later getting access to Mr. Yang.

1       And of particular concern in this case, Your Honor,

2   is the nation -- the People's Republic of China.  Now, both

3   Mr. and Mrs. Yang are U.S. citizens.  They're naturalized

4   citizens.  But they were both born in China.  And the United

5   States has no extradition treaty with China.

6       Presumably, both the Yangs still have family in

7   China.  They both speak Chinese to this day.  They speak

8   Chinese at home.  And they could re-assimilate to a life in

9   China with ease.  In addition, Your Honor, they have resources

10  that could assist them in failing to appear and fleeing.

11      The pretrial service reports document substantial

12  resources, but our grand jury investigation suggests that both

13  Mr. and Mrs. Yang have underreported their assets to pretrial

14  services.

15      We don't have access to up-to-date bank statements,

16  but we do have bank statements that were obtained throughout

17  the grand jury investigation that's ongoing.

18      So we've identified ten different financial accounts

19  that are in the name of Mr. Yang, Mrs. Yang, or both, as well

20  as corporate accounts in the name of BQ Tree LLC, which is the

21  corporate entity that's named in the two complaints in this

22  case -- or in these cases.

23      So just as a snapshot from the various times that we

24  obtained bank statements, there are two BQ Tree LLC accounts

25  with a -- we're dealing with two different financial

1  institutions.

2         But dealing with the first financial institutions --

3  the first of the two financial institutions, there's a BQ Tree

4  checking account as of April 30th that had 29 -- approximately

5  $2900 in it, a BQ Tree savings account that had $1,000 in it, a

6  checking account in Mr. Yang's name that had approximately

7  $5,700 in it.  Again, this is as of April 2019.

8         There was a savings account with a nominal amount in

9  it in Mr. Yang's name.  There's a joint checking account in

10  Mr. and Mrs. Yang's name that had $10,300 in it.  And then

11  there was a checking account in Mrs. Yang's name that had $1100

12  in it.

13         Again, that's historical.  That's April of 2019.

14         At a second financial institution, there was a -- and

15  this is as of June 2019.  At a second financial institution,

16  there's a joint checking account between Mr. and Mrs. Yang with

17  $82,800, approximately.

18         There was a checking account in Mrs. Yang and her

19  mother's name with $3,200 in it.

20         Again, we're still looking historically in June of

21  2019.  And then a BQ Tree checking account with approximately

22  $2,200 in it.

23         So looking historically, that's -- that's over

24  $100,000 in cash -- or savings and checkings account --

25  accounts.  In other words, very liquid accounts, that if they

1    got a bond today, they could go to the bank and withdraw that

2    money immediately.

3           There's also two investment accounts that we

4    identified.  And, again, looking historically to June 2019,

5    there was one that had $190,000 approximately.

6           We believe that at least $75,000 of that was used to

7    make a down payment on a house that they purchased, their

8    current residence, in -- in July of 2019.

9           So the whole $190,000 wouldn't be in that investment

10   account.  It would be approximately $115,000.

11          THE COURT:  And do you think that's the mutual fund

12   $400,000 referenced in Lieutenant Yang's pretrial report?

13          MR. COOLICAN:  It could be, Your Honor.  We didn't

14   see a mutual fund with -- with that total.  There's a second

15   investment account that we identified as of June 2019 with

16   $20,000 in it.

17          The point is, Your Honor, it appears that -- and none

18   of this accounts for the -- the thrift savings plan account

19   that Mr. Yang identifies.

20          So that would be --

21          THE COURT:  Mrs. Yang has an IRA account for $10,000.

22   Is that maybe the second one?

23          MR. COOLICAN:  That could be the second one.

24          THE COURT:  Okay.

25          MR. COOLICAN:  But, Your Honor, there's two points

1   here.  One is that we think there's some deception going on

2   regarding the Yangs and whether they were being truthful with

3   the pretrial services officer, but also the fact that they have

4   substantial assets that are liquid that they could get access

5   to quickly to help them if they were released on bond and they

6   desired to -- to abscond.

7           So, Your Honor, turning to the statutory factors that

8   the Court must consider --

9           THE COURT:  Can I ask you a quick question --

10          MR. COOLICAN:  Yes, Your Honor.

11          THE COURT:  -- on the personal banking -- you said

12  that there were ten accounts that you identified.  And you

13  listed some numbers, $2,900, $1,000, $5,700, nominal amount,

14  10,300 and $1,100.  And then you said -- said roughly $100,000

15  in savings.

16          That didn't add up to $100,000.  Did I miss an

17  account or an amount that you were talking about?

18          MR. COOLICAN:  So after those, Your Honor, I said at

19  a second financial institution there was a joint checking

20  account.

21          THE COURT:  The 82,000 --

22          MR. COOLICAN:  82,000.

23          THE COURT:  -- and the $3,200 and the $2,200?

24          MR. COOLICAN:  Yes, Your Honor.

25          THE COURT:  You were adding that?

1      MR. COOLICAN:  Yes, Your Honor.

2      THE COURT:  Okay.

3      MR. COOLICAN:  And it actually -- it approaches -- or

4  it exceeds $109,000, those accounts, before you get to the

5  investment accounts.

6      THE COURT:  Okay.

7      MR. COOLICAN:  Again, that's historical.  Some of

8  that money may have been moved, spent.  But in recent history

9  they had that much in liquid assets.

10      Regarding the nature and circumstances of the

11  offense, Your Honor, the two complaints are -- are at this

12  point of record -- I would note a few things about these

13  offenses.

14      They involve deception.  And if the Court were to

15  consider a bond in this case and direct the defendants released

16  under certain conditions, there's really no reason to credit

17  the defendants if they were to agree to particular conditions

18  of release.

19      The first complaint, among other things, alleges

20  lying on the ATF Form 4473 by Mr. Fan.  It also alleges that he

21  violated 18 U.S.C. 1001 by making any number of lies when

22  undergoing a review for the renewal of his security clearance.

23      And those deceptions all overlap, in that they're

24  designed to hide Mr. and Mrs. Yang's relationship with a

25  Chinese company Shanghai Breeze and its operators, Ge Songtao

1    and Zheng Yan.

2          Because when you're a naval flight officer with a top

3    secret clearance, you cannot have a relationship with Chinese

4    defense contractors.

5          And based on the transactions described in the

6    complaints, that's -- it at least appears that that's what

7    Ge Songtao is.  He's a Chinese defense contractor coming to the

8    United States to purchase vessels that have both civilian and

9    military applications.

10          THE COURT:  I noticed he was arrested in another

11    jurisdiction; is that correct?

12          MR. COOLICAN:  The other two defendants were both

13    arrested in the Western District of Louisiana.

14          THE COURT:  Both in the same district?

15          MR. COOLICAN:  Yes, Your Honor.

16          THE COURT:  And what's the status of their transfer

17    or detention?

18          MR. COOLICAN:  They both waived holding detention

19    hearings in Lafayette, Louisiana, reserving the right to hold

20    detention hearings here.

21          THE COURT:  Okay.

22          MR. COOLICAN:  And my understanding is transport of

23    those two defendants to this district at least begins this

24    Thursday.

25          THE COURT:  And they waived the identity hearings

1   there, as well?

2          MR. COOLICAN:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MR. COOLICAN:  But it's not just -- Your Honor, to

5   return to the idea of deception, it's not just Mr. Yang who was

6   engaged in deception.

7          Mrs. Yang, when she opened a bank account -- a bank

8   account for BQ Tree, their company, they represented that the

9   company -- they represented to the bank that the company sells

10  cell phone accessories and office supplies.

11         The FBI forensic accountant's review of the bank

12  records shows that that does not appear what they actually do.

13  There's no -- there's no purchase of -- of cell phone

14  accessories or office supplies.  It doesn't appear that money

15  comes in from customers other than Shanghai Breeze and people

16  affiliated with Shanghai Breeze.

17         And the magnitude of the money coming in from

18  Shanghai Breeze is significant.  It's over $200,000, as

19  described in the complaint over the last several years.

20         And none of that was disclosed on Mr. Yang's security

21  clearance questionnaire, despite the fact that it asks about

22  any other employment.

23         He didn't identify himself as being a business owner

24  or being an employee of BQ Tree LLC, even though he has

25  business cards identifying himself as a consultant for that

1   company, even though during a post-arrest interview, he's

2   admitted he has an e-mail account with -- with that company.

3          And we're not just talking about the sins of omission

4   where Mr. and Mrs. Yang have failed to disclose the

5   information.  We're also talking about affirmative

6   misrepresentations.

7          The complaint describes an incident in July of 2018

8   where Mr. Yang sought special liberty to travel, take -- he

9   represented to the Navy that he was taking his family to

10  Disney.  Documents show that he actually traveled to Nebraska.

11  And he admitted that in a post-arrest interview.

12         The purpose of that trip and that deception was so

13  that he could meet with Ge Songtao.  And he admitted during

14  that post-interview that he met with Ge Songtao during that

15  trip to Nebraska.  He didn't want the Navy to know about it, so

16  he lied.

17         Both the Yangs have also lied on their tax returns.

18  And it's easy to see their motive for doing that.  They want to

19  hide this relationship that they have with, again, what appears

20  to be a Chinese defense contractor.

21         Specifically, on their 2017 tax returns, which they

22  both signed electronically, they hid $53,000 in taxable income.

23  They -- part of that -- those falsehoods involved claiming

24  $32,000 in business expenses for costs of goods sold.

25         But, again, Your Honor, reviewing the bank statements

1   and having interviewed post-arrest Mrs. Yang and Mr. Yang, it

2   doesn't appear that their business, BQ Tree, actually buys and

3   sells anything.  So there couldn't be $32,000 in goods sold.

4   And there's certainly no banking activity showing that they

5   were purchasing and selling inventory.

6           Their tax returns also underreport their revenue by

7   $32,000.  And that's revenue coming in from Shanghai Breeze

8   into Mrs. Yang's account and the BQ Tree account.  And, again,

9   you know, they signed those tax returns electronically.

10          Regarding the weight of the evidence in this case,

11  Your Honor, I would -- I would largely -- in the first

12  instance, rely on the documentary evidence as described in the

13  complaint affidavit, which is substantial.

14          But, again, both defendants made incriminating

15  statements after being in there, advised of their rights, and

16  being interviewed by agents on the day of their arrest.

17          And I think I've said a couple of times post-arrest

18  interviews -- and I should clear that up.  These weren't

19  post-arrest interviews.  The interviews were actually conducted

20  shortly before they were taken into custody, in both instances,

21  as to Mrs. Yang and Mr. Yang.

22          As to Mr. Yang, he admitted that Ge Songtao asked him

23  to buy the firearm described in the complaint, that the

24  engraving on the firearm, GST, were Ge Songtao's initials.

25          It was his position that he and his wife actually

1    owned that firearm, but simply let Ge Songtao use it.  But that

2    statement is just simply not credible, in that it has

3    Ge Songtao's initials in it.

4          As described in the complaint, it was paid for with

5    funds provided by Ge Songtao.  It was stored in a storage

6    facility paid for with funds from Ge Songtao.

7          Mrs. Yang, regarding the firearm, also admitted that

8    that firearm had been purchased for Ge Songtao.

9          Mrs. Yang, during the interview regarding the export

10   violations, admitted that she knew that the vessels that she

11   had been working with Shanghai Breeze to purchase from the West

12   Coast maritime manufacturer -- she knew that those boats were

13   ultimately destined for Mainland China and not Hong Kong, as

14   she represented to the manufacturer, that she knew that the

15   listed purchaser for those boats, Belt Consulting -- she -- she

16   suspected that that was just a pass-through that was being used

17   to route the purchase money through, and that the money was

18   ultimately coming from Ge Songtao and Zheng Yan, the operators

19   of Shanghai Breeze.

20         She, during that interview, attempted to minimize her

21   husband's involvement in the business BQ Tree, asserting that

22   he really had no involvement in the business.  But we know

23   that's not true based on the recorded conversations between

24   Mr. and Mrs. Yang that are described in the complaint.

25         The conversations describe the fact that they -- they

1  both worked for -- or on behalf of Shanghai Breeze and

2  Ge Songtao.

3        The complaint describes an incident where they were

4  owed money.  And Mrs. Yang told her husband that they should

5  quit if they weren't paid the money they were owed.

6        Mr. Yang, during that same conversation, relayed that

7  he hoped that his wife didn't make him regret getting her this

8  employment with Ge Songtao and Shanghai Breeze.  So she wasn't

9  truthful.

10        While she made incriminating statements, she also

11  made statements that weren't truthful and that showed

12  deception, and showed the fact that she's trying to cover for

13  her husband, and trying to minimize his involvement in the

14  business.

15        Regarding the -- the history and characteristics of

16  this -- of these defendants, I won't belabor much of what I've

17  covered already.  Mr. Yang has been in the United States since

18  he was a teenager, since 1999.  And he's been a naturalized

19  citizen since 2006.

20        His mother and stepfather, I believe, are in New

21  York, but his father is in Canada.  And presumably he still has

22  other family in China.

23        Mrs. Yang was naturalized as a U.S. citizen in 2016.

24  Her mother lives in Jacksonville, but is not a citizen.  And

25  it's my understanding her father still lives in China, and

1   presumably she has other family in China.  They've lived in the

2   district for fewer than five years, since November of 2014.

3          During a search of their home, federal agents located

4   Chinese passports for both of them.  They were expired.  But

5   one has to question why they still had these passports.

6          It may have been motivated out of nostalgia.  But I

7   would note that in Mr. Yang's security clearance questionnaire

8   he acknowledged that he previously had a Chinese passport and

9   that it was expired, but he represented that it had been

10  shredded and that it had been returned to the Chinese Embassy.

11  So that's another misrepresentation that he made in his

12  background investigation.

13         Regarding Mrs. Yang's mental health, this should be

14  relevant to the Court's question of the risk of nonappearance.

15  The pretrial services report discusses -- and I believe

16  Mrs. Yang even discussed in open court -- suicidal ideation in

17  the past.

18         Suicide is sometimes called the ultimate risk of

19  nonappearance.  And it certainly could pose a danger if

20  Mrs. Yang was returned home, where she has two young children.

21         At this point, you know, we certainly don't have a

22  detailed mental health history on Mrs. Yang.  And based on her

23  appearance in court and what the agents report to me regarding

24  her interview, it seems like she's -- she's very much confident

25  and aware of what's happening and intelligent.  But she has

1  raised these issues.

2          I want to circle back.  And I apologize, Your Honor,

3  this is a little out of order.  There were some additional

4  statements that Mr. Yang made during his interview that I think

5  are of note and are consistent with the -- the pattern of

6  deception that he's engaged in.

7          When he was interviewed before being arrested last

8  Thursday, he initially suggested that he had never met

9  Ge Songtao in person, that this was a social media

10 relationship.

11         By the end of the interview, he acknowledged that

12 they had met several times, that the on-line relationship began

13 in 2006 or 2008, that they first met in person when he was

14 still stationed in Pensacola, in approximately 2013, that they

15 had met in Nebraska, that they had met in Jacksonville.

16         When asked about his wife's business, Mr. Yang

17 estimated that she made a few or a couple thousand dollars a

18 year.  That's not consistent with the -- with the bank

19 statements, which show that over $200,000 has come in during

20 the time period specified in the complaint.

21         He initially denied having any involvement in that

22 business.  But when confronted with the business card and asked

23 about the e-mail account, he acknowledged that -- that that

24 was, in fact, a legitimate business card, and that he had that

25 e-mail account and used it.

1          He denied knowledge of money coming in from Shanghai

2     Breeze.  But, again, it's simply inconceivable, given the

3     volume -- the volume of money and the fact that -- the steps

4     he's taken to hide that -- that relationship.

5          So the point is, Your Honor, that Mr. -- Mr. Yang,

6     unless confronted with evidence by the agents, just simply

7     refused to acknowledge the existence or the -- his

8     relationship, his longstanding relationship with his Chinese

9     defense contractor Ge Songtao.

10          Regarding the nature and seriousness of the danger

11     posed, again, Your Honor, we're primarily relying on risk of

12     flight here.

13          There's certainly danger when individuals conspire

14     together to purchase firearms for individuals who are

15     prohibited from possessing firearms.

16          We've already discussed the danger that Mrs. Yang may

17     pose to herself and the welfare of her family if -- if her

18     mental health problems manifest themselves.

19          And I began by talking about the -- the risk to our

20     nation's secrets that Mr. Yang has in his head, the ultimate

21     bargaining chip that he could use to get assistance in removing

22     his family and himself from this country to a nation from which

23     he could never be extradited.

24          That's my presentation, Your Honor.  I'm happy to

25     answer any questions that you may have.

1          THE COURT:  All right.  Thank you.

2          And, Mrs. Yang, are you -- were you able to

3     understand that?  Or did you need the translator for anything?

4          DEFENDANT Y. YANG:  No.  I can understand him.

5          THE COURT:  You can understand?  Okay.  Speak up and

6     let your counsel or me know if you need a translation of any

7     word.  Okay?

8          DEFENDANT Y. YANG:  Okay.

9          THE COURT:  All right.  Mr. Carson?

10          MR. C. CARSON:  Thank you, Your Honor.

11          May it please the Court?

12          And, Judge, just so the Court is aware, I think that,

13     to a degree, some of what Mr. King and I intend to discuss this

14     afternoon, there's certain to be some overlap there.

15          THE COURT:  Okay.

16          MR. C. CARSON:  We actually do have a third-party

17     custodian which we will be offering for the Court.

18          THE COURT:  Okay.

19          MR. C. CARSON:  I'm going to let Mr. King address

20     that part of it.  It is actually Mrs. Yang's stepfather --

21          THE COURT:  Okay.

22          MR. C. CARSON:  -- who we'll be offering for the

23     Court.  But I may allude to that.  Mr. King is actually going

24     to be the one who deals with that.  And we would intend to

25     offer him as a witness a bit later here today.

1    So what I can speak to, though, Judge, is -- and

2  certainly the Court is aware of this.  When we're in this

3  position as defendants and as defense counsel, our exposure to

4  the facts of the case is clearly much more limited than what

5  exists on the part of the government.

6    And we're currently not in a position where we are

7  prepared to point by point rebut what has been alleged.  At

8  this point our familiarity with the case essentially consists

9  of review of the complaint and some very brief discussions with

10  our clients.

11    So I cannot go bit by bit and really address many of

12  the issues.  And I -- I can't say that those issues are

13  completely without merit.  I certainly appreciate the gravity

14  of some of what is alleged here.

15    But with that said, a complaint is still a complaint.

16  There's a long way to go between what comes in the course of a

17  complaint and what may or may not be proven at the end of the

18  day.

19    And one of the things that I do know is in spite of

20  what may be alleged in a complaint, there are certain

21  presumptions that attach to criminal defendants as a product of

22  the system that we're in, one of which is a presumption of

23  innocence.  And that presumption still stands, independent of

24  what is alleged in a complaint.

25    And more, I guess, immediately speaking, there is a

1  presumption in favor of release that exists and lies with a
2  defendant in the situation that we are in here for purposes of
3  this detention hearing.
4       Now, the government's burden at this juncture is to
5  prove by a preponderance that there is a risk when it comes to
6  flight, or to prove by clear and convincing that there is some
7  sort of risk of harm to the community.  And I certainly can --
8  I'm in a position to address both of those today.
9       THE COURT:  I think the United States is just
10 proceeding under the presents a risk of flight, which is the
11 preponderance of the evidence standard.
12      MR. C. CARSON:  And that was how I took it, Judge.
13 It was a brief presentation.  Certainly if the Court would
14 prefer --
15      THE COURT:  And I think when he was talking about
16 danger -- or type of danger to others in the community, I think
17 he was just -- that's one of the factors that are considered in
18 assessing the risk of flight.
19      MR. C. CARSON:  Certainly, Judge.  And if that's the
20 case, I think I can address that under risk of flight.
21      THE COURT:  Did I get that right, Mr. Coolican?
22      MR. COOLICAN:  Yes, Your Honor.
23      THE COURT:  All right.
24      MR. C. CARSON:  Okay.  And so in terms of the risk of
25 flight, Judge -- and as I stated earlier, the gravity of this

1  and some of those circumstances regarding Mr. Yang's personal

2  knowledge, his experiences, and some of what we were dealing

3  with in the course of the complaint, I -- I get it.  There is

4  an international connection here.

5           He is, however, a naturalized U.S. citizen.  He has

6  been here for a protracted period of time.  He has two

7  tender-age children that live with he and his wife here

8  locally.  He owns a residence in Mandarin.  At least one of his

9  children attends The Bolles School at this point.

10          Furthermore, they have other family who are here

11  locally.  Mr. Yang's parents -- or Mr. Yang's mother and

12  stepfather both live domestically.  His father does live

13  continently within Canada.

14          And then as to Mrs. Yang, which I'm sure Mr. King

15  will address, she also has family that is actually here local

16  in Duval County, in Jacksonville.

17          And so when we're talking about -- and I know the

18  government's position was that maybe a foreign power or an

19  enemy may have strong incentive to just come and scoop up

20  Mr. Yang and take him to start a new life.  But you don't just

21  walk away from those things.

22          He has a two-year-old and a five-year-old and

23  significant other family ties here within the country.  He does

24  have a lengthy history of military service.  He first enlisted

25  in 2007.

1          He is not someone -- nor is anyone who has

2     children -- just in a position to walk away freely.  I mean,

3     there's a lot of personal baggage that would come with that.

4          And I think the insinuation by the government that it

5     would just be so easy for him to do that -- I don't know that

6     that really applies when it comes to someone's personal life,

7     their young children, and -- and those types of things.  So

8     it -- I don't know that I agree with the government that he may

9     be in a position to just do that.

10          Now, as far as the insinuation regarding a passport,

11     things of that nature, I have an expired passport sitting in my

12     safe at my house.  I just have not renewed it.

13          So I don't know that there's necessarily anything

14     nefarious or bad about that, the fact that it exists.  You get

15     stamps on your passport if you want to show where you've been

16     or just know where you've been.

17          I mean, a lot of people have that.  And I don't know

18     that there's anything necessarily bad about that.  Furthermore,

19     the government is in possession of all of that now anyways.

20          So even if it were a circumstance where the Court

21     would be concerned, the government is certainly not going to

22     release that at this point.  So those passports are currently

23     in the possession of the government.

24          Now, as far as what we would be asking the Court to

25     consider today, I think one of the underlying currents in a

1    case like this, just knowing what little I do know about it,

2    there stands to be a very substantial discovery process that

3    goes on in this case.

4          There is going to be an absolute massive volume of

5    documents that are dealt with, many of which I suspect are

6    probably going to be in Mandarin.

7          What that tells me is that we're in for a lengthy

8    ride here.  This is not just going to be quickly dealt with.

9    And when we are talking about someone who is in pretrial

10   detention, I think everyone agrees that's very hard time to do.

11   Sitting in a county jail somewhere is not a good way to spend

12   your days.

13         And when we are talking about a case that stands to

14   go on for a protracted period of time, that in and of itself

15   is -- is a difficult pill to swallow, particularly for someone

16   who's never been through that before, has zero criminal

17   history, and does have young children and a family that needs

18   provided for.

19         One of the other things that I would point out to the

20   Court, Mr. Yang is well-educated.  He has an engineering

21   degree.  And he may well be in a position -- should he be

22   granted some measure of pretrial release, he may be in a

23   position to actually provide some degree of support for his

24   family.

25         There is no doubt going to be a huge economic cost

```
 1   that is entailed with the representation here, the fact that
 2   his military career is essentially going to be gone at this
 3   point.  And he may be in a better position than his wife to
 4   actually provide.
 5          So I believe that there are personal financial
 6   considerations that should be taken into account.  He speaks
 7   very good English.  He is bilingual.
 8          So I think in that sense, that coupled with his
 9   education may put him in a position where he can at least work
10   and earn some measure of money to offset, say, cost of
11   representation and, furthermore, just the cost of living.
12          They do have two young children, a house.  And when
13   you have a family to support, I mean, those things don't just
14   go on hold when you go into custody.
15          So I would ask that the Court consider that as well,
16   because I think that there are some big benefits on the
17   personal side to him being out.
18          Now, under 3142, the Court does have a number of
19   measures that can be taken to help offset some of the risks
20   that may come with a defendant being on pretrial release.
21          And I would certainly offer for the Court that we
22   would be amenable to pretty much anything and everything that
23   is listed in that statute, and more.
24          In the contemporary times in which we live, there are
25   things such as electronic monitors.  There are all sorts of
```

1   very intensive measures that can be taken that are short of

2   someone simply remaining in pretrial detention for the pendency

3   of the case.

4          And we would be open to any and all of those.  If the

5   government is, in fact, correct regarding assets -- even if

6   they're not, just looking at the pretrial services report,

7   there is some measure of assets there between the defendants

8   and their families.

9          We would not be opposed to the Court imposing some

10  sort of specifics, as far as them putting up -- whether it's

11  money, property, what have you, as a means to help ensure his

12  appearance here in court.

13         And while the allegations by the government suggest

14  that there are international connections, I'm not fully

15  convinced that those are as extensive as the government is

16  alleging.

17         I'm not denying that there's any connection, but I

18  don't know that they are quite as extensive as -- as to what's

19  being alleged.

20         And I think that in this circumstance, where there

21  are a number of less restrictive measures the Court could

22  impose, I believe that those could largely mitigate many of the

23  government's concerns, as far as flight goes.

24         So we would simply ask that the Court consider some

25  measure that is less restrictive than simply leaving Mr. Yang

1    in custody for the pendency of what stands to probably be a

2    pretty long-winded case.

3            And that would be our request, Judge.

4            THE COURT:  All right.  Thank you.

5            Mr. King?

6            MR. KING:  Good afternoon, Your Honor.

7            THE COURT:  Good afternoon.

8            MR. KING:  Your Honor, in turning to -- I'll endeavor

9    to not be duplicative of Mr. Carson's efforts.  This is a

10   husband and wife, so a lot of the things that would apply to

11   one would apply to the other.

12           I know Mr. Ely with pretrial services discussed that

13   they could be third-party custodians.

14           Mr. Yang's stepfather and mother are actually present

15   in the court today.  They drove down from New York as soon as

16   they heard this happen.  They've been assisting with the

17   family.

18           Mrs. Yang's mother is currently with the children

19   right now.  They're at the ages of two and five.  And her

20   husband is here.  He spends some time in Illinois.

21           His plan was to move down here about -- about two or

22   three weeks from now and stay with them for a couple of months.

23   He's going to move that up now.  He has in the past, after her

24   pregnancies, stayed with them for months at a time, and

25   actually stayed in the home with Mr. and Mrs. Yang.

1          Turning to a couple of things that the government

2   addressed with Mrs. Yang -- and they tie together as the -- the

3   family that Mrs. Yang has in China, along with her mental

4   health history.

5          The only family she really has in China is her

6   father, who had a long history of physical, mental, and other

7   types of abuse with regard to Mrs. Yang.  They have a very

8   strange relationship and does speak a lot -- her mental health

9   issues actually stem from that relationship.

10          She has zero desire to see him.  She's spoken with

11   him once as a favor to her mother to try to find a doctor for a

12   distant family member that her mother was seeking out.  In the

13   past year, that's been their only contact.  They don't speak.

14          She has a grandmother that I believe she speaks with

15   once a year for Chinese New Year to wish her a Happy New Year.

16   And that's the extent of her family ties to China.  Her family

17   is here.  Her mother is here.  And her stepfather is here.  And

18   her children are here, along with her husband and mother-in-law

19   and his -- her husband.

20          The mental health issues with regard to the suicidal

21   ideation stem primarily from a severe bout of postpartum

22   depression after the birth of their firstborn child a little

23   over five years ago.

24          She was hospitalized for that, received treatment,

25   and has not received continuing treatment since that.  That was

1   a very serious time.  And Mr. Harbaugh, her stepfather, did

2   spend time with the family to help out during that time.

3          That's principally the issues that she expressed, was

4   during that time period and was a result of the birth of their

5   first child.

6          She did not -- she had some postpartum depression

7   after the birth of their second child, but it was nowhere near

8   as severe or serious.

9          And she reports to me that she did not have -- she

10  wasn't -- didn't receive anywhere near the treatment, didn't

11  have the suicidal ideations that she did after the first bout

12  of postpartum depression with her first child.

13         THE COURT:  Pretrial services suggested there was --

14  the absence of ongoing treatment was not because it wasn't

15  necessary, but because she chose not to have the treatment,

16  whether it was medication or otherwise.

17         MR. KING:  Your Honor, in terms of the -- the

18  first -- the truly serious incident, that moment had passed.

19  With regard to continuing treatment, certainly I think -- I

20  think it would not be a bad idea for the Court to -- to order

21  some evaluation and treatment were she to be released.

22         She doesn't believe she needs it.  But given the

23  gravity and the amount of stress that's probably put on her

24  with this situation, it wouldn't be a bad idea for her to

25  receive that treatment, given just how stressful the situation

1    has been, along with her time in custody out at the Baker

2    County Jail so far.

3            I know there was some issues that the government

4    raised in terms of deception with pretrial services.  You know,

5    some of that I know is due to a language barrier.

6            The -- for instance, she reported that she has

7    quarterly contact with her mother-in-law and twice-a-year

8    contact with her stepfather.

9            Speaking to both of them and then speaking with her

10   again, she just didn't understand the question and didn't

11   explain that very well.  She has very frequent contact with her

12   mother-in-law.

13           Not a ton of phone contact with her stepfather, but

14   the visits are twice a year.  After the birth of their last

15   child, he stayed with them for six months.

16           And we would ask the Court to consider him as a

17   third-party custodian.  We've also spoken with the parents in

18   terms of electronic monitoring.

19           They've gone ahead and set up in the home -- they

20   didn't have a landline phone before.  They've gone ahead and

21   set that up.  So if the Court were inclined to require

22   electronic monitoring, there is a landline phone that's already

23   set up and ready to go, if that's required.

24           And, Your Honor, at this time, I'd like to call

25   Mr. Jim Harbaugh, her stepfather.

1       THE COURT:  All right.  Harbaugh?

2       MR. KING:  Harbaugh.

3       THE COURT:  Mr. Harbaugh, you'll come forward to this

4  witness box, please.  And if you'll -- when you get there, if

5  you'll stay standing and raise your right hand to be placed

6  under oath.

7       COURTROOM DEPUTY:  Do you solemnly swear or affirm

8  that the answers you will give during these proceedings will be

9  the truth, the whole truth, and nothing but the truth, so help

10  you God?

11      THE WITNESS:  Yes, I do.

12      COURTROOM DEPUTY:  Thank you.

13      THE COURT:  All right.  Thank you, sir.  If you'll

14  please take a seat.  Move your seat close to that microphone.

15  And Mr. King will have some questions for you.

16      Mr. Coolican might have some questions for you.  And

17  then I might have some questions, as well.

18      Mr. King?

19      MR. KING:  Thank you, Your Honor.

20         **JIM HARBAUGH, DEFENDANTS' WITNESS, SWORN**

21                    **DIRECT EXAMINATION**

22  BY MR. KING:

23  Q.   And, Mr. Harbaugh, I know you're kind of soft spoken, so

24  I'd just ask you to speak up.

25  A.   Okay.

1    Q.    And you also tend to nod your head when answering

2    questions.   So just -- because everything is being taken down,

3    yes or no, so everybody is clear as far as the answers go.

4          If you could introduce yourself to the Court and

5    spell your last name.

6    A.    Jim Harbaugh, H-a-r-b-a-u-g-h.

7    Q.    And how do you know the Yang family, both Mr. and Mrs.

8    Yang?

9    A.    I am Yuki's stepfather.

10   Q.    And Yuki is Mrs. Yang?

11   A.    Yes.

12   Q.    That's what she goes by?

13   A.    Yes.

14   Q.    And how long have you known Mr. and Mrs. Yang?

15   A.    I met them in the summer of 2014.

16   Q.    And how long have you been married to Mrs. Yang's mother?

17   A.    Since December of 2014.

18   Q.    And you dated her for a period before that?

19   A.    13 months before that.

20   Q.    And where is she currently?

21   A.    She is currently at home taking care of the two -- my two

22   grandkids.

23   Q.    And when you say the "home," what home is that?

24   A.    The home of Yuki and Fan.

25   Q.    And prior to coming to Court, we discussed what a

1    third-party custodian is?

2    A.    Yes.

3    Q.    And we discussed that you'd be responsible to report both

4    to pretrial services and the Court if any conditions of

5    pretrial release were not being met?

6    A.    Yes.

7    Q.    And, Mr. Harbaugh, can you look at Judge Barksdale and

8    promise her and Mr. Ely that if -- if either -- any conditions

9    are not being met that you'll call them immediately?

10            THE WITNESS:  Yes, I would call immediately, Your

11    Honor.

12    BY MR. KING:

13    Q.    And just as a background for you, prior to -- my

14    understanding is you're retired?

15    A.    Could you say again?

16    Q.    My understanding is you're retired?

17    A.    Yes, semi-retired.

18    Q.    And what are you retired from?

19    A.    I worked at Mitsubishi Motors Manufacturing of America for

20    about 16-and-a-half years.

21    Q.    Okay.  And did you ever work outside the United States?

22    A.    No.

23            THE COURT:  I'm sorry, Mr. King.

24            Did you say I am retired or I'm semi-retired?

25            THE WITNESS:  I'm semi-retired.

1      THE COURT:  Semi.

2      THE WITNESS:  I do a little -- I do a little home

3  repair on the side.

4      THE COURT:  Okay.  Thank you.

5  BY MR. KING:

6  Q.   And is that something you were planning on doing in

7  Jacksonville when you were down here?

8  A.   Maybe.  Yeah.

9  Q.   And I -- you probably heard me discuss with the Court --

10  what were your plans in terms of staying with Mr. and Mrs. Yang

11  this upcoming year?

12  A.   Well, I was planning on coming down here shortly before

13  Thanksgiving, and then staying for a few months.

14  Q.   And have you stayed with them before for any length of

15  time?

16  A.   Yes, I have.  I've stayed with them on multiple occasions

17  for differing lengths of time, but at times encompassing a few

18  months, even several months, during the birth of the second

19  grandchild.

20  Q.   Is that something you're willing to do, is stay in their

21  home?

22  A.   Yes.

23  Q.   And you'd be able to assist the Court in making sure they

24  follow all rules and conditions of pretrial release?

25      THE WITNESS:  Yes, Your Honor.

1    MR. KING: Your Honor, can I have a brief moment?

2  BY MR. KING:

3  Q.   And, Mr. Harbaugh, have you ever been arrested or charged

4  with a crime before?

5  A.   No.  Never.

6    MR. KING: Your Honor, I have nothing further for

7  Mr. Harbaugh.

8    THE COURT: All right.

9    MR. KING: I'll tender to Mr. Coolican.

10   THE COURT: Thank you.

11   Mr. Carson, did you plan to ask any questions?

12   MR. C. CARSON: No, ma'am.  I believe Mr. King

13  covered what needed covered as far as Mr. Harbaugh.

14   THE COURT: All right.  Thank you.

15   Mr. Coolican?

16                       **CROSS-EXAMINATION**

17  BY MR. COOLICAN:

18  Q.   Mr. Harbaugh, would the plan be that you would reside in

19  the Yangs' home with your wife?

20  A.   Yes.

21  Q.   Okay.  And I'm just trying to understand.  Do you

22  currently live with your wife?

23  A.   Well, we live separate for a few months of the year.  And

24  then I come to Jacksonville and we live together.  So not every

25  month of the year do we live together, no, sir.

1          I own a home in Illinois.  And I have lived there my

2   entire life.  So I continue to -- I'm currently trying to fix

3   the home up and sell it.  And then we plan to live together

4   after that, which we hope to be in about another two years.

5   Q.   Okay.

6          MR. COOLICAN:  All right.  Those are my questions,

7   Your Honor.

8          THE COURT:  All right.  Thank you.

9          Mr. Harbaugh, do you have any firearms?

10         THE WITNESS:  I have one firearm.

11         THE COURT:  One firearm?  And is it a concealed

12  firearm?  Or do you keep -- where do you keep it?

13         THE WITNESS:  I keep it in my home.

14         THE COURT:  In which home?

15         THE WITNESS:  In Illinois.  I'm sorry, Your Honor.

16         THE COURT:  That's okay.

17         All right.  Thank you.

18         Mr. King, any follow-up?

19         MR. KING:  No, Your Honor.

20         THE COURT:  All right.  Thank you, sir.

21         THE WITNESS:  Thank you, Your Honor.

22         MR. KING:  And, Your Honor, just in brief summation,

23  understanding the mental health concerns, in terms of risk of

24  flight and going through the 3142, you know, certainly there's

25  plenty of things that can be done to assure that Mr. and Mrs.

1    Yang can remain in the home and caring for their children

2    while -- while the -- during the pendency of this case.

3         The family that Mrs. Yang has in China is very

4    distant.  The one close family member that she actually has,

5    she has a very poor relationship with, and, you know, certainly

6    there's no risk that she would ever reside in that home or

7    leave to go -- go be with that family member.

8         The -- her ties to this community are significant.

9    Her children are here.  Her mother is here.  Her stepfather

10   will be down here.

11        Her in-laws have come all the way down from New York.

12   They drove through the night to make sure they could be here to

13   support them and help out the family during this time.

14        We believe the government has not met its burden to

15   demonstrate that Mrs. Yang is a flight risk.  She should be

16   given conditions.

17        Electronic monitoring, if the Court believes it

18   necessary, would more than be sufficient to assure that she

19   does not leave.

20        I've spoken with her.  With regard to her travel --

21   sorry.  I thought I heard something.

22        With regard to her travel, she rarely even leaves

23   Duval County.  Certainly a condition that she not leave --

24   their home is right near St. Johns County, but she reports to

25   me that she rarely goes over the creek there.

1      But certainly a condition to stay within the

2  Jacksonville Division, she would -- she'd have no reason to

3  leave the Jacksonville Division counties, and Duval County.

4      She indicated that she doesn't have anywhere that she

5  has to be in St. Johns regularly.  And if the Court determined

6  that keeping in Duval County would be -- help assure that she

7  appeared for future court dates, she'd be more than willing to

8  do that.

9      And Mr. Harbaugh is, you know, we would submit, an

10  excellent third-party custodian who's, you know, a lifelong

11  citizen of the United States.  He's married to Mrs. Yang's

12  mother, cares for the grandchildren.

13      And he's not only willing to stay in the home, which

14  normally would be a big ask, this is something he's done in the

15  past and is comfortable doing.

16      For those reasons, we would ask that the government's

17  request to detain Mrs. Yang be denied and she be given

18  conditions.

19      THE COURT:  All right.  Thank you.

20      MR. KING:  Thank you.

21      THE COURT:  Mr. Coolican, anything else?

22      MR. COOLICAN:  Just briefly, Your Honor.

23      THE COURT:  And, Mr. King, I'm sorry, I forgot to

24  ask, do you have a comfort level with your client's ability to

25  understand English, at least the English spoken here today?

1      MR. KING:  Yes, Your Honor.  And I spoke with

2   Ms. Loeschen before court.  There is occasional times where I

3   might have to phrase something a little differently.  But if I

4   phrase it a little differently, we've had no issues

5   communicating.  It just takes a little bit longer than it might

6   normally.  And --

7      THE COURT:  How long has she lived in the United

8   States?

9      MR. KING:  If I may just have a moment.

10     (Counsel confers with defendant.)

11     MR. KING:  11 years, Your Honor.

12     THE COURT:  11 years?  Okay.  Thank you.

13     MR. COOLICAN:  Your Honor, electronic monitoring is a

14   useful tool in some cases.  It's helpful to enforce curfews.

15   It's helpful to monitor a defendant's location to ensure that

16   they're not going to locations where they can get in trouble.

17     But this is not an electronic monitoring case.  The

18   concern here is that they're going to simply disappear and

19   leave the country.

20     An electronic ankle bracelet can be cut off and the

21   Yangs could be in a car and within 18-hours' drive be at the

22   border of Mexico or Canada.

23     With respect to the notion that this is going to be a

24   long -- it's going to be a long pretrial period, respectfully,

25   that's not a relevant consideration.  The Court is either going

1    to find that by the preponderance of the evidence that there is

2    a flight risk or there is not.

3            And the notion that there may be prolonged pretrial

4    proceedings really doesn't factor into that.  So we'd ask that

5    both defendants be held in custody pending trial.

6            THE COURT:  All right.  Thank you.

7            It's about 2 o'clock right now.  I'm going to take a

8    very short break.  And I'll be back on the record at about

9    2:05, 2:10.  Thank you.

10           COURT SECURITY OFFICER:  All rise.

11        (Recess from 1:59 p.m. to 2:04 p.m.)

12           COURT SECURITY OFFICER:  All rise.  This Honorable

13   Court is now back in session.

14           MR. D. CARSON:  Your Honor, may I address the Court

15   on behalf of Mr. Yang before you render your decision?

16           THE COURT:  Yes.  If you'll hold on one second,

17   Mr. Carson.

18           Thank you.  We're back on the record.  And everybody

19   is in the courtroom, both Lieutenant Yang, Mrs. Yang, their

20   counsel, and then counsel for the government.

21           Yes, sir, Mr. Carson?

22           MR. D. CARSON:  Your Honor, the prosecutor mentioned

23   that he's concerned that my client, Mr. Yang, would flee the

24   country.  And, of course, this reminds me of *Falsgraf* -- I

25   mean, the attenuation of those circumstances and the

1    speculation, I think are not appropriate at a detention

2    hearing.  Many --

3            THE COURT:  *Falsgraf*, of law school fame?  Is that

4    what you're referencing?

5            MR. D. CARSON:  I am.

6            THE COURT:  Okay.

7            MR. D. CARSON:  And the *Falsgraf* case, you know, as

8    we know -- you know, attenuated circumstances.  We're talking

9    about if this happens, if this happens, if this happens, if

10   this happens, then this might happen.

11           There's no definitive information that my client has

12   made any entreaties to the Chinese government or that they,

13   vice versa, have done that to him, in addition to which I know

14   the prosecution believes that this is going to be a short case.

15           I've been doing this for many decades.  And I've done

16   a lot of translation work, just on open wires, where everybody

17   is speaking English, and they take days and months to be

18   certain if the information you're hearing over a wiretap, a

19   phone, and in this case a dash cam, is accurate.

20           THE COURT:  I don't think he disagreed it might be

21   lengthy.  I think he was arguing it's not relevant to the

22   decision.

23           MR. D. CARSON:  Well, I believe it is relevant to the

24   decision in this respect.  We have to translate from Mandarin

25   to English.

1          Our ability to do that is extraordinarily limited if

2    we don't have direct and unfettered access to both of these

3    defendants.

4          Because in Chinese, as the Court probably knows,

5    there are many inflections in the language itself which

6    entirely change the meaning.

7          And if there's a certain dialect that was being

8    used -- my point is this, Your Honor, in doing translation work

9    with linguists for the FBI, or other agencies, it's not a

10   foregone conclusion that they properly translated the

11   information.

12         And so what you see in that complaint may ultimately

13   turn out not to be exactly what was said, in addition to which

14   if I'm speaking to my wife and I'm nodding my head a certain

15   way or saying something sarcastically, the Court and the

16   complainant -- and the FBI has done an excellent job in putting

17   together this complaint, but they may not have the true meaning

18   of what was said.

19         So when the prosecution relies on that as being

20   authentic and accurate, I don't doubt that they believe that it

21   is.  But I question whether or not it actually truly is based

22   on the problem and difficulties that occur with translation.

23         Thank you, Your Honor.

24         THE COURT:  All right.  Thank you, Mr. Carson.

25         All right.  I'll just make some brief statements, but

1    I'll follow up with an order.  The matter comes before the

2    Court on a motion by the government to detain Lieutenant Yang

3    and Mrs. Yang pending the trial of the matter.

4              In considering the request, first, Lieutenant Yang

5    and Ms. Yang are entitled to the presumption of innocence.

6    Nothing that takes place now or that was said earlier affects

7    that presumption.

8              Instead, the purpose of the hearing is to decide,

9    notwithstanding the presumption of innocence, if Lieutenant

10   Yang and Ms. Yang should be detained pending trial.

11             Second, under the Bail Reform Act, pretrial detention

12   is an exceptional step.  Under the act, they have to be

13   released before trial unless there's a finding that no

14   condition or combination of conditions exists that will

15   reasonably assure their appearance.

16             The act requires the least restrictive conditions be

17   imposed that are necessary to provide those reasonable

18   assurances.  But if there aren't conditions that will

19   reasonably assure appearance as required, then the Court's

20   required to order them held in custody pending the outcome of

21   the trial.

22             The government argues that Lieutenant Yang and

23   Mrs. Yang should be detained because of risk of flight.  Here,

24   the government has to show by a preponderance of the evidence,

25   as Mr. Coolican said, more likely than not, that no conditions

1   or combination of conditions will reasonably assure their
2   presence as required.
3          There's no presumption in this case either way.  The
4   factors the Court considers are these, the nature and
5   circumstances of the alleged offense, weight of the evidence
6   against each defendant, their history, characteristics, and,
7   finally, the nature and seriousness of the danger to others in
8   the communities.
9          I've considered all of those factors and what each
10  side said this afternoon, and -- and, of course, I've read the
11  complaints themselves.
12         Based on that evidence, I find the United States has
13  met its burden.  And I'll articulate my findings better in an
14  order when I've had a chance to sit down and write them down.
15         But just briefly, the nature and circumstances of the
16  offense -- Mr. Coolican made a compelling case that the alleged
17  offenses involve multiple acts of deceptions by both, and
18  deceptions to government agencies and government authorities.
19         The weight of the evidence -- if we just look at the
20  complaints -- is very strong against each.
21         History and characteristics, they're both highly
22  intelligent.  They both have foreign ties.  And with Mrs. Yang
23  there is a history of suicidal ideations, and even a history of
24  an attempted suicide.
25         The nature and circumstances of the danger to the

1    community -- it's a really unusual case, of course.  I think we

2    all know that.  But the nature and circumstances of the danger

3    include how Mr. Coolican started and ended his presentation,

4    which is a danger to our national security.

5            And then with Mrs. Yang, there's also the danger

6    presented by mental illness and the inability to see a need for

7    treatment.

8            Mr. Harbaugh seems nice enough as a third-party

9    custodian.  The Court is not convinced that -- that he has a

10   really close relationship -- a close, good relationship with

11   Mrs. Yang, or that he would be able to provide the reasonable

12   assurances.  And -- and I am persuaded by Mr. Coolican's

13   argument regarding electronic monitoring.

14           That being the case, Lieutenant Yang and Mrs. Yang

15   will be held in custody pending the outcome of the trial.  And,

16   again, I'll enter a written order setting forth more articulate

17   findings.

18           Anything else, Mr. Coolican?

19           MR. COOLICAN:  No, Your Honor.

20           THE COURT:  Anything else from either Mr. Carson or

21   Mr. Carson?

22           MR. C. CARSON:  Not at this time, Judge.

23           THE COURT:  All right.  And from Mr. King?

24           MR. KING:  No, Your Honor.

25           THE COURT:  All right.  Thank you.  Court's in

 1    recess.

 2              COURT SECURITY OFFICER:  All rise.

 3        (Recess from 2:12 p.m. to 2:44 p.m.)

 4              COURT SECURITY OFFICER:  You may be seated.

 5              THE COURT:  All right.  We're back on the record in

 6    Lieutenant Yang and Mrs. Yang's case.  It looks like

 7    Mr. Coolican is here for the United States.

 8              And Mr. Carson, Jr., for Lieutenant Yang.  And

 9    Mr. King for Mrs. Yang.  And they are both present.

10              I don't think we have the interpreter on the

11    telephone.

12              All right.  If there's an issue with interpretation,

13    just let me know, Ms. Yang.

14              Mr. King, my courtroom deputy explains that you

15    wanted to go back on the record?

16              MR. KING:  Yes, Your Honor.  And then I think

17    Mr. Carson has the same issue.  We were retained for purposes

18    of detention hearing only.  We have not filed notices yet, have

19    not sorted that out.

20              We would ask the Court to set a brief amount of time

21    for status of counsel.

22              THE COURT:  Okay.  And, Mr. Carson, you're in the

23    same boat?

24              MR. C. CARSON:  That -- that is correct, Your Honor.

25              THE COURT:  Okay.

1          MR. C. CARSON:  And I will offer for the Court, we

2   have been in discussions with the family.  I believe that

3   Mr. King is similarly situated.  We are optimistic that the

4   representation will run the duration of the case, but we're not

5   quite there yet.  The families are marshaling the resources.

6          THE COURT:  Okay.  So let's look at calendars next

7   week.  How much time would be reasonable?

8          MR. C. CARSON:  Frankly, Judge -- and I know the

9   government is a little bit under the gun time-wise here.  So I

10  think as soon as a week we should be pretty clear on where we

11  stand.

12         THE COURT:  Okay.  When is the preliminary hearing,

13  Ms. Loeschen?

14         COURTROOM DEPUTY:  It is October 31st.

15         THE COURT:  Mr. Carson, would it be possible, and

16  Mr. King, to do it late in the day on the 29th?  That's

17  Tuesday.

18         MR. C. CARSON:  If I may have just a moment, Your

19  Honor.

20         MR. KING:  Your Honor, may I check my phone?

21         THE COURT:  Yes.

22         MR. KING:  Your Honor, that will work with my

23  schedule.

24         THE COURT:  Okay.

25         MR. COOLICAN:  That's fine for the United States,

1   Your Honor.

2           THE COURT:  Okay.

3           MR. C. CARSON:  That is acceptable for us, as well.

4           THE COURT:  Okay.  We'll set status of counsel in the

5   case on October 29th at 4 o'clock.

6           MR. KING:  Thank you, Your Honor.

7           THE COURT:  And, of course, if you're retained before

8   then, like formally for the remainder of the case, simply file

9   a notice with the Court and I'll cancel that status-of-counsel

10  hearing.

11          MR. KING:  Thank you.

12          THE COURT:  And then beyond that, just so you're

13  aware -- I know you stepped in the case, but we do have the

14  preliminary hearing on October 31st before one of the other

15  magistrate judges.

16          If an indictment is not returned before then, that

17  will go forward, unless your clients waive that.

18          Okay?  Anything else?

19          MR. KING:  Nothing from Mrs. Yang, Your Honor.

20          THE COURT:  All right.

21          MR. C. CARSON:  Not at this time, Judge.

22          MR. COOLICAN:  Your Honor, just briefly, I tendered

23  to your courtroom deputy for filing in open court, providing

24  copies to counsel, a notice of intent to use Foreign

25  Intelligence Surveillance Act information.

1          THE COURT:  Thank you.

2          And, Mr. Carson, I meant to say something earlier.

3   Now I have an opportunity to.

4          MR. C. CARSON:  Yes, ma'am.

5          THE COURT:  The other Mr. Carson mentioned a need for

6   translation and personal contact with Lieutenant Yang in order

7   to effectuate that.

8          And it's -- it's less of a detention issue and more

9   of a due process issue.  If there's any -- if you're having any

10  trouble contacting or meeting with your client to prepare for

11  the case, simply file a motion with the Court alerting the

12  Court to any issues that you're having, and then the type of

13  resolution you'd like to see.

14         MR. C. CARSON:  Certainly, Judge.

15         THE COURT:  Okay.

16         MR. C. CARSON:  And as far as Mr. Yang is concerned,

17  his English is very good.  We've met a number of times.  I

18  don't have any concerns as far as that goes.

19         THE COURT:  The translation is your concern.  And

20  that's fine.  And we had that issue come up once in another

21  case actually involving Chinese translation, and it worked

22  itself out fine.

23         But in your case, if -- if there's a need to -- if

24  you're having trouble getting to see him in pretrial detention,

25  just let the Court know.

1        MR. C. CARSON:  Thank you very much, Your Honor.  We
2   appreciate it.
3        THE COURT:  All right.  Anything else?
4        MR. COOLICAN:  No, Your Honor.
5        MR. C. CARSON:  Not at this time, Judge.
6        THE COURT:  All right.
7        MR. KING:  No, Your Honor.  Thank you.
8        THE COURT:  All right.  Thank you.
9        COURT SECURITY OFFICER:  All rise.
10   (The digitally recorded proceedings concluded at
11   2:48 p.m.)
12                          - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

### CERTIFICATE

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a
true and correct computer-aided transcription from the official
electronic sound recording of the proceedings in the
above-entitled matter.


        DATED this 15th day of November, 2019.



                    s/Shannon M. Bishop
                    _____

                    Shannon M. Bishop, RDR, CRR, CRC